

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 30, 2020

**BY ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re:  *United States v. Louis Martin Blazer*, a/k/a "Marty,"
>      **17 Cr. 563 (ER)**

Dear Judge Ramos:

The Government respectfully submits this letter to advise the Court of pertinent facts concerning the assistance the above-captioned defendant, Louis Martin Blazer, a/k/a "Marty," has provided to the Government in the investigation of corruption in college basketball that led to the conviction of ten individuals, including several NCAA Division 1 college basketball coaches.  In light of these facts, and assuming that Blazer complies with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Blazer in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.  Blazer is scheduled to be sentenced on February 6, 2020, at 10:00 a.m.

### Blazer's Personal Background

Blazer graduated from Carnegie Mellon University in 1992 with a degree in industrial management.  Following college, Blazer worked for several finance firms, including Morgan Stanley and Salomon Smith Barney, before starting his own firms, as described in detail below. Blazer is married, has three kids, and lives in Pittsburgh, Pennsylvania.

### The Underlying Criminal Conduct

On September 15, 2017, Blazer pleaded guilty to a five-count Information charging him in two separate criminal schemes: (i) the misappropriation of client funds while serving as a registered investment advisor; and (ii) the defrauding of various universities by bribing student-athletes at those universities to retain Blazer as a financial advisor or business manager.  Given the Court's familiarity with the record in this case, and in particular with Blazer's criminal conduct based on his extensive trial testimony, the Government has briefly summarized Blazer's conduct below.

## I.    __Blazer's Misappropriation of Client Funds__

### 1.   *Blazer's Entities*

In 2008, Blazer founded Blazer Advisors and Blazer Capital, both based in Pittsburgh, Pennsylvania. Blazer Capital described itself as a "premier" personal services advisory firm that specialized in catering to the needs of professional athletes, entertainers, and high net worth individuals and families. Blazer Capital was retained by its clients to perform such functions as paying their bills and managing other aspects of their personal lives and financial commitments, including assisting in paying their taxes and developing and managing personal budgets. Blazer Advisors was an affiliated registered investment advisory firm that performed traditional investment management functions for certain Blazer Capital clients. For example, Blazer Advisors advised clients concerning investment opportunities in traditional investments like whole life insurance policies, as well as non-traditional investments such as film production or other business opportunities. Among Blazer's clients were several professional football players.

In late 2011, Blazer formed Princeton-Blazer, a joint venture with Princeton Group. Princeton-Blazer was a registered investment adviser that advised over a dozen clients and had millions in assets under management on a discretionary basis. The vast majority of Blazer's advisory clients at Blazer Advisors transitioned to become clients of Princeton-Blazer. As described below, when Blazer's misconduct came to light, he was forced to forfeit his interest in and role at Princeton-Blazer.

### 2.   *Blazer's Misappropriations*

In or around 2009, Blazer agreed to raise funds for a movie entitled "Mafia the Movie" (hereinafter, "Mafia"). Blazer agreed to solicit these funds after one of his business partners introduced him to an actor and producer ("Producer-1"), who were planning to produce Mafia. At around the same time, he also agreed to attempt to raise money for "Sibling," another Producer-1 movie project. Although Blazer hoped to be able to raise at least $1 million for the films, he was not able to raise the full amount and ultimately misappropriated funds to cover the balance.

As part of his efforts to raise money for Mafia and Sibling, in approximately the fall of 2010, Blazer approached one of his clients, Client-1, about investing in movies. According to Client-1, he had no interest in such investments and turned Blazer down. According to Blazer, Client-1 gave him permission to invest $100,000 in the Mafia movie. Although Blazer believes he had authorization to invest $100,000, he intentionally invested far more without Client-1's permission. Specifically, from October 1, 2010 to December 29, 2010, Blazer caused five transfers totaling $450,000 to be made from Client-1's personal brokerage account to a bank account in Mafia's name. Blazer caused an additional $100,000 transfer from Client-1's personal brokerage account to a bank account in Sibling's name. Blazer had access to Client-1's accounts by virtue of his role as Client-1's financial advisor. To effect the transfers, Blazer used a copy of Client-1's signature to create forged documents that convinced Client-1's brokerage firm that Client-1 had authorized the withdrawals.

Almost two years after Blazer invested Client-1's funds in the movie projects, Client-1 asked questions that led him to discover that Blazer had misappropriated his funds. According to Client-1, in summer 2012, he was reviewing his financial portfolio using a computer program that Blazer Capital provided. During his review, Client-1 noticed a $100,000 notation in his portfolio related to Mafia. Client-1 questioned an attorney who worked for Blazer and Blazer Capital ("Attorney-1"), about the notation, indicating to Attorney-1 that he had never authorized any investment in Mafia. Attorney-1 informed Client-1 that his portfolio actually contained a $450,000 investment in Mafia and a $100,000 investment in Sibling. According to Blazer, Client-1 knew that $100,000 of his money had been invested in the Mafia project, but did not know that an additional $450,000 of his money had been invested in the Mafia and Sibling movies. Blazer claims Client-1 learned that $450,000 of his money had been used to invest in the Mafia and Sibling movies after talking with Attorney-1 about liquidating his $100,000 investment in Mafia. At any rate, after learning about the investments, Client-1 became upset and, through his agent, demanded that Blazer return all of his money. He also took steps to end his advisory relationship with Blazer and his companies. After Blazer initially was unable to pay, Client-1 threatened to take legal action against Blazer unless he was repaid by November 2012.

To repay Client-1, Blazer misappropriated the assets of another advisory client, Client-2. By virtue of his advisory relationship with Client-2, Blazer had access to a brokerage account and two bank accounts of Client-2's. On November 20 and 21, 2012, Blazer used his access to the Client-2 accounts to cause three transfers of $200,000 each, totaling $600,000, from Client-2's accounts to a Blazer Capital account. In one instance, Blazer had a durable power of attorney over the account. In the other two instances, Blazer forged Client-2's signature on documents authorizing the transfers. Blazer then caused $550,000 of these funds to be wired from the Blazer Capital account to Client-1, thus returning Client-1's unauthorized investments in Mafia and Sibling. Blazer wired the remaining $50,000 that he obtained from Client-2's accounts to a country music management company associated with a country music artist ("Music Management Company-1"). The country music artist associated with Music Management Company-1 ("Country Artist-1") had previously asked Blazer to help Country Artist-1 raise $100,000 for Country Artist-1's record label in exchange for Country Artist-1 referring some of Country Artist-1's music artists to Blazer. Later, on January 4, 2013, Blazer arranged for an additional $50,000 transfer from a Client-2 bank account to Music Management Company-1. Thus, in late 2012 and early 2013, Blazer transferred a total of $650,000 from Client-2's accounts to fund Blazer's various movie and music ventures.

Client-2 did not authorize the transfers from his accounts. In interviews with the SEC, Client-2 stated that he never authorized Blazer to make any investments on his behalf in Mafia and did not agree to purchase Client-1's interests in the movies. Client-2 also never authorized any investment in Music Management Company-1. Client-2 did not become aware of the transfers until he was contacted by the SEC in fall 2013. Client-2 stated that he did not sign any of the documents authorizing the transfers, nor did he recall ever signing a power of attorney giving Blazer control over one of his bank accounts. Client-2 terminated his relationship with Blazer shortly after his interview with the SEC.

*3.  Blazer's Lies to the SEC*

The SEC conducted an examination of Princeton Group and Princeton-Blazer in July 2013. When confronted by SEC exam staff about the suspicious transfers, Blazer told a series of lies.

Blazer provided false information to the SEC in three different ways.  First, in an interview with the SEC exam staff, Blazer claimed that Client-2 had authorized the transfers to Client-1. Second, after the interview, he worked with Princeton-Blazer's chief compliance officer ("CCO") to prepare a written submission, which was provided to the SEC (the "SEC Submission"). Although the SEC Submission ultimately was signed by the CCO, the email evidence indicates that it was drafted by Blazer.  The SEC Submission falsely suggested that Client-1 and Client-2 authorized the transactions and provided a false narrative of what led to the transaction between Client-1 and Client-2.  The letter claimed, among other things, that in 2012, Client-1 "was seeking to create liquidity for several of his projects and decided to sell his investment in two films (Mafia and Sibling)" and that Client-2 "agreed to purchase Client-1's interest in the two films for $550,000 paid via two separate wires" through Blazer Capital.  The letter also claimed that he and Client-2 "discussed both the pros and cons of investing in alternative investments" and agreed that "this was a relatively small portion of his entire net worth so the risk of this investment to his overall net worth was not material."  Finally, the letter also claimed that Client-2 agreed to invest $50,000 into Music Management Company-1.  Third, along with his oral and written misstatements, Blazer created a series of documents designed to mislead the SEC exam staff into believing that he had at least attempted to document the investments of Client-1 and then Client-2 in Mafia, Sibling, and Music Management Company-1.  These included purported unsigned deal documents memorializing Client-2's purchase of Client-1's interest in Mafia and Sibling.  In addition to those purported documents, Blazer manufactured an unsigned agreement between Client-2 and Music Management Company-1 that tracked the form of the executed Blazer-Music Management Company-1 agreement produced to the SEC.  From the documents, it appears that Blazer merely took the agreement he executed with Music Management Company-1, substituted Client-2 for himself, and provided the falsely created document to the SEC exam staff.

### 4. Blazer's Admissions

Blazer initially agreed to appear for a joint proffer with the United States Attorney's Office for the Southern District of New York (the "USAO") and the SEC in June 2014.  At his initial proffer, Blazer admitted both to his misconduct with respect to the misappropriation of client funds, and to paying college football players in order to induce them to sign with his financial advisory firm when the player joined a professional league.  Blazer's conduct with respect to bribing college football players was unknown to the Government at the time and was not the subject of either the USAO's or the SEC's investigation into Blazer.

With respect to the misappropriation of his clients' funds, Blazer admitted the misconduct initially identified by the SEC with respect to funds that Blazer managed on behalf of Client-1 and Client-2.  Blazer also identified for the SEC additional misappropriations he had made from Client-2 and other advisory clients as a result of Blazer's inability to raise sufficient funds for Mafia and Sibling in 2010.  In particular, he admitted to taking $450,000 from Client-1 without Client-1's knowledge or approval for Mafia and Sibling.  Client-1 claims that an additional $100,000 was invested without his knowledge or approval, though Blazer maintains that Client-1 authorized an initial investment of $100,000 for Mafia.  Blazer also took steps to

ensure that Client-1 could not see the full extent of his investments in Mafia and Sibling by ensuring that Client-1's entire $550,000 investment in Mafia and Sibling did not appear on a software platform used by Blazer Capital clients to review their investment portfolio.  Blazer also admitted to misappropriating $650,000 from Client-2 in November 2012 and January 2013 to pay back Client-1 and to invest an additional $100,000 in Music Management Company-1. He admitted that Client-2 was not aware of any of this, and that he forged certain documents to cause money to be transferred from Client-2's accounts.  Finally, Blazer conceded that he had lied to the SEC exam staff in his interview and in the SEC Submission he prepared on behalf of Princeton-Blazer.

In addition to the misappropriations from Client-1 and Client-2, Blazer acknowledged at the initial proffer that prior to the November 2012 transfers from the Client-2 accounts, he had misappropriated an additional $250,000 from Client-2 for Mafia in October 2011.  He also identified an additional $600,000 that he misappropriated from approximately 3 other clients for Mafia.  With respect to Sibling, in addition to the $100,000 that he took from Client-1 and Client-2, Blazer admitted to misappropriating an additional $300,000 from three other clients.

5.  *Blazer's Loss Amount for Securities Fraud*

In total, Blazer misappropriated approximately $2.25 million from five advisory clients for Mafia and Sibling and an additional $100,000 for Music Management Company-1.  At times, Blazer made distributions or returned some of the principal to clients.  In addition to the return of $550,000 to Client-1 (which came from Client-2), Blazer made additional distributions of approximately $240,000 to other clients from in or about 2011 to in or about 2014.  Accordingly, Blazer's net misappropriations amounted to approximately $1,560,000.

## II.   Blazer's Paying of College Athletes

As noted earlier, during Blazer's initial proffer with the USAO, and in subsequent proffers, he informed the USAO that, from in or about 2000 to in or about 2013, Blazer made payments to at least two dozen NCAA Division I college athletes in an effort to induce those athletes to retain Blazer's services if, and when, they became professional athletes.  The amount of money Blazer typically paid a player ranged from approximately a couple hundred dollars to approximately twelve thousand dollars.  In total, Blazer stated that he has paid at least $70,000 to players[1] at the following universities:  the University of Pittsburgh, Northwestern University, the University of Alabama, Penn State University, the University of North Carolina, the University of Michigan, and Notre Dame University.  Several of those players ultimately retained Blazer's services.

Blazer informed the USAO that he never paid a college coach, other than at the direction of law enforcement as part of our investigation (as discussed further below).  However, Blazer stated that, on one occasion in or about 2009 or 2010, a coach at Penn State University ("Coach-1") sought Blazer's assistance in making a payment to a player's father.  According to Blazer,

---

[1] Blazer believes he may have given money to a family member of a player on a handful of occasions, but it was not his general practice to pay family members.

Coach-1, then an assistant coach at Penn State University, set up a meeting between Blazer and the father of a current Penn State University football player ("Father-1"). It was Blazer's understanding, based on conversations he had had with Coach-1, that Coach-1 wanted Father-1's son ("Player-1") to play at Penn State University for another year, but Father-1 wanted his son to leave school early and enter the National Football League ("NFL") draft because Father-1 was having some financial troubles and needed money. At the meeting, which took place at Coach-1's house, Father-1 indicated that he would let his son stay in school at Penn State in exchange for $10,000. Blazer ultimately agreed to loan $10,000 to Father-1 (which he paid by check), but Player-1 left school early anyway and entered the NFL draft. Blazer recalls that he later was paid back his $10,000 by either Father-1 or Player-1.[2]

## Blazer's Criminal History and Uncharged Conduct

Prior to the instant offenses, Blazer had never been convicted of a crime. He has been implicated – but not charged – in a state investigation into benefits provided by sports agents to college football players. In particular, in or about 2013, an investigation by the North Carolina Secretary of State's office led to the arrest of a sports agent, a real estate agent, and others for violating North Carolina's Uniform Athlete Agents Act by providing certain football players at the University of North Carolina with improper benefits. Several news articles relating to the investigation identified Blazer as one of the agents who allegedly paid money to North Carolina football players. In proffer sessions with the Government, Blazer admitted to paying several football players at the University of North Carolina, including three players at the center of the state investigation. Blazer informed the USAO that he was interviewed twice by the Secretary of State's office about their investigation, and that on both occasions he was truthful.

In addition, in or about 2011, a former NFL client of Blazer's ("Client-3") filed a complaint with the Financial Industry Regulatory Authority ("FINRA") against Blazer and his employer at the time, Smith Barney, claiming that they had mismanaged his funds. Blazer claims that he never mismanaged Client-3's funds, nor did he do anything improper with his money. Blazer believes that Client-3's complaint stems from the fact that Client-3 spent his money recklessly, ultimately resulting in him losing much of his NFL earnings. Client-3 and Smith Barney ultimately settled Client-3's complaint for approximately $850,000.

---

[2] Blazer also recalled that Coach-1 set up meetings between him and multiple football players at Penn State University, many of whom became Blazer's clients when they entered professional sports. Some of the meetings took place in the coach's house and office. Blazer made payments to at least three of the players Coach-1 helped him meet while those players were in college. Blazer never paid Coach-1 any money for setting up meetings with players, but he did help him get a free hotel room in Miami once or twice and helped him get a significant discount on a Sports Utility Vehicle through a car dealership in Texas. Blazer told the car dealership that if they gave a discount to Coach-1, Blazer would in turn send clients of his (specifically those Coach-1 helped him retain) to the dealership to purchase cars.

## Blazer's Cooperation

The Government's investigation of corruption in college athletics began with Blazer's cooperation. When Blazer began proffering with the USAO in June 2014, he volunteered information about his bribing of student-athletes and his knowledge of other corrupt financial advisors and agents. Blazer also agreed, without having yet received a cooperation agreement, to immediately begin making recordings against individuals believed to be engaged in, or willing to engage in, corrupt behavior relating to college athletics. For the next three years, Blazer flew around the country making countless recordings against various individuals. Blazer's interactions with those individuals ultimately helped provide support for at least ten T-III wiretap authorization orders.

Blazer's efforts required a significant level of personal sacrifice. For example, for the first two years of Blazer's cooperation, Blazer paid for his own travel expenses himself even when the travel was entirely related to law enforcement operations in which Blazer was participating. Also, at various points, Blazer's cooperation was extremely time consuming, as Blazer had to be in contact with potential targets on almost a daily basis. Blazer also traveled extensively as part of his cooperation, making recordings in New York, South Carolina, Georgia, Alabama, Nevada, Florida, and West Virginia. Blazer maintained this high level of proactive cooperation all while continuing to raise three children and maintaining legitimate employment.

The end result of Blazer's cooperation was arguably the biggest and most significant federal investigation and prosecution of corruption in college athletics. In September 2017, at the conclusion of Blazer's proactive cooperation, ten defendants in three related cases were charged with crimes relating to corruption in college basketball. In *United States v. Gatto*, 17 Cr. 686 (LAK), a marketing executive at the athletic apparel company Adidas, along with a former Adidas consultant and an aspiring manager were charged with funneling tens of thousands of dollars in bribes to the families of top high school student athletes in connection with those players decisions to attend Adidas-sponsored schools. In *United States v. Person*, 17 Cr. 683 (LAP), and *United States v. Evans*, 17 Cr. 684 (ER), four coaches at top college programs were charged with receiving substantial cash bribes in return for abusing their positions to steer the players on their teams to retain the services of the managers and agents making the bribe payments. Through the course of two trials, including one in which Blazer testified, and a series of guilty pleas, the cases resulted in the conviction of ten defendants.

## Blazer's Trial Testimony

Blazer testified extensively during the trial of *United States* v. *Evans*, 17 Cr. 684 (ER). In *Evans*, five individuals were charged with participating in a scheme where college basketball coaches accepted bribes in exchange for steering players on their teams to retain the services of certain managers and/or advisors. The bribe payers included Christian Dawkins, an aspiring sports manager who had recently formed a new sports management business (the "Dawkins Company"), and Merl Code, an Adidas consultant who had agreed to work with the Dawkins Company. The bribe recipients included Lamont Evans, an assistant coach at Oklahoma State University, Emmanuel Richardson, a/k/a "Book," an assistant coach at the University of Arizona,

and Anthony Bland, a/k/a "Tony," an assistant coach at the University of Southern California. The defendant coaches pled guilty while Dawkins and Code went to trial.

The Government's case against Dawkins and Code was primarily based on recordings, many of which were made by Blazer or with his assistance.  Accordingly, Blazer's testimony was critical in helping the jury understand the context of certain recordings, the hidden meaning behind some of the words used by the scheme's participants, and the various roles and interpersonal dynamics among the co-conspirators.  Blazer's knowledge of the sports world and experience as a financial advisor to professional athletes was also helpful in explaining to the jury the role of agents, advisors, and other sports professionals, the identities of some of those individuals, as well as the basic contours of college and professional basketball.

While the Court, having presided over the *Evans* trial, is of course familiar with it, a portion of Blazer's most helpful testimony is summarized below:

- Blazer testified about conversations he had with Dawkins in which Dawkins admitted to paying bribes to assistant basketball coach Lamont Evans and explained the benefits of paying bribes to coaches like Evans.  (Tr. 261-300).  Specifically, Blazer testified to Dawkins emphasizing to him that, "[y]ou're skipping over a crucial step in trying to establish relationships, business relationships with these players if you're not dealing with the college coach."  (Tr. 272).

- Blazer testified to Lamont Evans introducing him to Jeffrey Carroll, a college basketball player Evans coached at the time, in exchange for the bribe payments Blazer paid Evans, at Dawkins's urging.  (Tr. 322-323).  Blazer stated, "I gave Lamont $2,000 in cash . . . and Lamont made the introduction of Jeffery Carroll to me to introduce me as his guy and the person that would handle Jeffrey's business advisory services when he turned pro."  (Tr. 323).

- Blazer testified about attending a meeting with most of the scheme participants, including Dawkins, in June 2017, on a yacht in Manhattan, New York, where paperwork to finalize the formation of the Dawkins Company was signed.  (Tr. 335-358).  Blazer stated, "everybody agreed that they were going to sign the paperwork – Munish, Christian, and the undercover agent – the paperwork to finalize the details of the business that they were forming.  The undercover agent funded the account for the business by giving Munish $25,000 in cash and we all went over a list of coaches that Christian had sent . . . for the purposes of doing the same thing we were doing with Lamont Evans, paying those coaches."  (Tr. 335).

- Blazer testified about meeting Merl Code with Dawkins and others in Manhattan, New York in June 2017.  (Tr. 358-414).  At that meeting, Blazer learned the value that Code brought to the scheme and explained it to the jury.  Specifically, Blazer stated that Code had experience working at Nike and Adidas, and as a result, had connections with youth basketball coaches and college basketball coaches.  (Tr. 364-365).  Accordingly, Blazer testified, Code was "in a position with his experience and knowledge to help Christian know where money needs to be spent to establish a real relationship or to make sure that

money that's going towards certain things, whether it's a player or a coach or a grassroots coach or their families isn't – isn't wasted, is well spent."  (Tr. 401-402).  Blazer also testified to Code having accepted a bribe of $2,000 at that meeting in exchange for agreeing to set up meetings with college coaches.  (Tr. 365).

- Blazer testified about travelling to Las Vegas, Nevada in July 2017 to meet with several college basketball coaches Dawkins and Code had arranged for Dawkins, Blazer, and an undercover law enforcement agent to meet.  Blazer testified that "the purpose of these meetings was to meet these coaches and to start a plan with some of them to pay those coaches, and others, just to meet with the possibility that we were going to pay them at some point in time, if needed." (Tr. 419).  Blazer explained what was discussed in the meetings with each of the coaches, which coaches ultimately received a bribe, how much each of the bribed coaches received, and made clear that "Christian told us who was to receive money and who was not."  (Tr. 419-465).

Based in no small part on Blazer's testimony, Dawkins and Code were ultimately convicted after a two-and-a-half week trial before Your Honor.

## Assessment of the Defendant's Cooperation

To say that Blazer's cooperation was helpful to the Government would be an understatement.  Blazer's cooperation was absolutely critical in investigating and prosecuting a series of precedent setting public corruption cases relating to corruption in college athletics.  Blazer met with the Government an extraordinary amount of times — often in person and typically for multiple hours at a time—and he always made his best efforts to provide truthful, accurate information and to carry out any operations at the direction of law enforcement to the best of his ability.  Most importantly, he was forthcoming on a range of topics, both about his own misconduct and about the misconduct of others, and his testimony on those matters was consistent with and corroborated by other witnesses, audio recordings, and documentary evidence.  His cooperation contributed significantly to the Government's successful prosecution of ten defendants in three related corruption cases.  And he testified at a highly-publicized trial that resulted not only in the conviction of a former Adidas consultant and an aspiring manager, but also in an important ongoing public discourse about corruption in college athletics.

## Analysis of Section 5K1.1 Factors

1.  "[S]ignificance and usefulness" of assistance (5K1.1(a)(1))

Blazer's cooperation was both significant and useful.  As discussed above, his cooperation sparked an investigation into corruption in college athletics that ultimately resulted in charges being brought against ten defendants across three related cases.  In addition, Blazer testified in a trial stemming from one of those cases, *United States* v. *Evans*, 17 Cr. 684 (ER), against Christian Dawkins and Merl Code, both of whom were convicted at trial.  Blazer's testimony helped streamline hours or recorded conversations against the trial defendants, and helped provide context for those conversations.  Blazer's cooperation may have also impacted the decision of the

defendant coaches to plead guilty. Accordingly, Blazer's cooperation was unquestionably significant and useful.

2. "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))

Blazer provided truthful, complete, and reliable information regarding his interactions with the charged defendants during his cooperation. He answered questions honestly, both during meetings with the Government and during direct and cross-examination. Blazer also provided truthful, complete, and reliable information regarding his own crimes and transgressions, including crimes of which the Government had previously been unaware, namely, his paying of bribes to college atheltes.

3. "[N]ature and extent" of assistance (5K1.1(a)(3))

Blazer's cooperation was undoubtedly extensive. As stated earlier, for approximately three years, Blazer flew around the country making countless recordings against various individuals. Over the course of that time period, Blazer also met or spoke with the Government on myriad occasions. In preparation for trial, Blazer walked the Government through several hours of recordings, oftentimes going over the same recordings repeatedly to ensure the Government fully understood the context of the recordings. Blazer testified over the course of three days at trial, which included several hours of intense cross-examination.

4. "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))

As Your Honor is aware, it is inherently risky for a criminal defendant to cooperate with the Government, particularly where he was involved in a high-profile scheme, with powerful co-conspirators. Although the Government is unaware of any physical danger to Blazer or his family, in the Government's experience, it is common in the federal prison system for cooperating witnesses to be subject to harsh treatment at the hands of the other prisoners. Thus, Blazer may be subject to retaliation because of his status as a cooperating witness.

5. "[T]imeliness" of assistance (5K1.1(a)(5))

Blazer's cooperation was extremely timely. As stated earlier, Blazer began cooperating with the Government before he was charged by either the SEC or the USAO. As a result, Blazer was able to make recordings against various individuals before his misconduct regarding his misappropriation of client funds became public. Moreover, perhaps because of Blazer's timely cooperation, Blazer was able to maintain his relationships with people of interest to the Government even after his prior misconduct became public, therefore making it possible for Blazer to continue to make recordings until the investigation's completion. Moreover, as stated earlier, it was Blazer who brought the potential misconduct of others with respect to corruption in college athletics to the Government's attention.

### Conclusion

In light of the foregoing, the Government respectfully submits that Blazer's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of corruption in college athletics. *See* U.S.S.G. § 5K1.1(a)(1). The Government also believes that the information provided by Blazer was "truthful[], complete[], and reliab[le]." *See id.* § 5K1.1(a)(2). Accordingly, assuming that Blazer complies with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence Blazer in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


By: /s/ Robert L. Boone
    Robert L. Boone
    Noah Solowiejczyk
    Eli Mark
    Assistant United States Attorneys
    (212) 637-2208


cc (by ECF):   Martin A. Dietz, Esq.