IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LOUIS MARTIN BLAZER | ) | Docket No. 1:17 CR 563-01 |
| | ) | |
| Defendant. | ) | |

MEMORANDUM IN AID OF SENTENCING

AND NOW comes Defendant, Louis Martin Blazer, by and through his attorney, Martin A. Dietz, Esquire, and respectfully files the following Memorandum in Aid of Sentencing on the following basis:

Defendant, Louis Martin Blazer (hereinafter "Mr. Blazer"), incorporates the facts set forth in the Presentence Investigation Report.    Additionally, Mr. Blazer asks the Court to consider the information and arguments contained herein in fashioning the appropriate sentence in this case.

I.    **Introduction**

Mr. Blazer will stand before this Honorable Court on February 6, 2020 humbled of and truly remorseful for her actions.  As set forth more fully below, he has accepted responsibility for his conduct and on September 15, 2017 pled guilty to an information.   As set forth more fully herein, upon consideration of all of the key sentencing factors under 18 U.S.C. § 3553(a), a non-custodial sentence is appropriate and just for this case.

## II. The Law

Furthering the trend started by the United States Supreme Court in <u>United States v. Booker</u>, 543 U.S. 220 (2005), the Supreme Court restored the tremendous discretion that sentencing courts possessed prior to the promulgation of the sentencing guidelines. <u>Gall v. United States</u>, 522 U.S. 38, 128 S.Ct.586 (2007). Largely as a result of the Supreme Court's pronouncements in <u>Gall</u> and <u>Kimbrough v. United States</u>, 522 U.S. 85, 128 S.Ct. 558 (2007), the sentencing options available to district court judges have "significantly broadened." <u>United States v. Moon</u>, 513 F.3d 527, 544 (6th Cir. 2008), quoting <u>Gall</u>, 128 S.Ct. at 602.  District courts are now free from any requirement that they mechanically adhere to the tight strictures of the guidelines and, importantly, sentencing courts are not required to even presume that the guidelines provide an appropriate sentence in a given case.

The Supreme Court has explained that the "reasonableness" of a sentence is the controlling query and it further held that any sentence imposed on a defendant, whether below, above or within the sentencing guidelines, is to be reviewed "under a deferential abuse-of-discretion standard." <u>Gall</u>, 128 S.Ct. at 598.

Citing <u>Rita v. United States</u>, 551 U.S. 338, 127 S.Ct. 2456, 169 L.Ed.2d 203 (2007), the <u>Gall</u> Court explained that a sentencing court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range".   128 S.Ct. at 596.  See also <u>Kimbrough, supra</u>.   In <u>Gall</u>, noting that the sentencing guidelines should only be the "starting point" and the

"initial benchmark" of a sentencing proceeding, the Court noted that the Guidelines are not the only consideration.   Id.   Next, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the §3553(a) factors to determine whether they support the sentence requested by a party."   128 S.Ct. at 596. In doing so, however, a sentencing court is not permitted to presume that the Guidelines range is reasonable. 128 S.Ct. at 596-597.    The sentencing judge "must make an individualized assessment based on the facts presented" at sentencing.  128 S.Ct. at 597.   The weight given to each factor in sentencing a defendant is "firmly committed to the discretion of the sentencing judge." United States v. Verkhoglyad, 516 F.3d 122, 131 (2d Cir. 2008).  If the sentencing judge decides that a sentence outside the applicable Guideline range is justified, the sentencing judge "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.    Gall, 552 U.S. at 50, 128 S.Ct. 586. Continuing on, the Gall Court explained that a sentencing court must "adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.  Id. see Wise, 517 F.3d at 215-216 (reiterating Gall sentencing analysis).


Notwithstanding the decreased rigidity of the sentencing guidelines, the first step in determining a federal defendant's sentence requires a sentencing court to consider the federal sentencing guidelines.    After calculating the appropriate sentencing guidelines range, a sentencing court should also consider any motions for departure. Such a motion is distinct from a request for a "variance" from a sentencing guideline range.   See United States v. Vampire Nation, 451 F.3d 189, 195 (3rd Cir. 2006)(A departure is based on the sentencing guidelines. A

variance is based on consideration of the §3553(a) factors).  As set forth in <u>United States vs. Fumo</u>,  655 F.3d 288, 317 (3rd Cir. 2011):

> There are "two types of sentences that diverge from the original Guidelines range . . . . A traditional sentencing 'departure' diverges . . . from the originally calculated range 'for reasons contemplated by the Guidelines themselves.' In contrast, a 'variance' diverges . . . from the Guidelines, including any departures, based on an exercise of the court's discretion under § 3553(a)." <u>United States v. Floyd</u>, 499 F.3d 308, 311 (3d Cir. 2007) (internal citations omitted). This distinction is more than mere formality. "Although a departure or a variance could, in the end, lead to the same outcome . . . it is important for sentencing courts to distinguish between the two, as departures are subject to different requirements than variances." <u>Id.</u> "[D]istrict courts should be careful to articulate whether a sentence is a departure or a variance from an advisory Guidelines range." <u>United States v. Vampire Nation</u>, 451 F.3d 189, 198 (3d Cir. 2006).

As set forth above, district courts are required to exercise their discretion by considering the relevant §3553(a) factors in setting the sentence it imposes regardless of whether it varies from the sentence calculated under the Guidelines.  Despite a sentencing court's mandate to correctly calculate the advisory guideline range, the directives of recent sentencing jurisprudence make clear that courts may no longer uncritically apply the guidelines.  In fact, as set forth above, a sentence within the advisory guidelines is not presumptively reasonable.  A sentencing court "may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." <u>United States v. Cavera,</u> 550 F.3d 180, 189 (2d Cir. 2008).

In evaluating a sentencing court's factual findings, the Supreme Court has noted that a sentencing judge's firsthand experience with a particular case places the sentencing judge in a better position to evaluate the facts relative to sentencing.  In <u>Kimbrough</u>, the Supreme Court, citing <u>Rita</u>, acknowledged that a sentencing judge "has 'greater familiarity with . . . the individual case and the individual defendant than the [Sentencing] Commission or the appeals court.  128 S.Ct. at 574.  "He [or she] is, therefore, in a superior position to find facts and judge their import under 3553(a) in each particular case." <u>Id</u>. citing <u>Gall</u>, 128 S.Ct. at 598.

Justice Scalia explains the role of the sentencing guidelines in the post-<u>Booker</u> era in his dissent from <u>Booker</u>'s remedial holding:

> Thus, logic compels the conclusion that the sentencing judge, after considering the recited factors (including the guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.  If the majority thought otherwise, if it thought the Guidelines not only had to be considered (as the amputated statute requires) but had generally to be followed its opinion would surely say so.

<u>Booker</u>, 543 U.S. at 305-306 (Scalia, J., dissenting in part).   As set forth above, a sentencing court is not permitted to presume that the Guidelines range is reasonable. <u>Gall</u>, 128 S.Ct. at 596-597. In fact, a sentencing judge may "disregard" the Guidelines.  <u>Rita</u>, 127 S.Ct. at 2466.   This notion now gives a sentencing court the discretion to disagree with and reject policy judgments of the Sentencing Commission and the Guidelines.

According to <u>Gall</u>, <u>Booker</u> and its related authority, in determining the minimally sufficient sentence, sentencing courts are required to consider the following 18 U.S.C. §3553(a)

factors:

1) the nature and circumstances of the offense and the history and characteristics of the defendant;

2) the need for the sentence imposed –
    (A) To reflect the seriousness of the offense, to promote respect for the law, and to
        provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical
        care, or other correctional treatment in the most effective manner;

3) the kinds of sentences available;

4) the kinds of sentence and the sentencing range established for –

    (A) the applicable category of offense committed by the applicable category of defendant
        as set forth in the guidelines –
        (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title
            28, United States Code, subject to any amendments made to such guidelines
            by act of Congress (regardless of whether such amendments have yet to be
            incorporated by the Sentencing Commission into amendments issued under
            section 944(p) of title 28); and
        (ii) that, except as provided in section 3742(g), are in effect on the date the
            defendant is sentenced; or
    (B) in the case of a violation of probation or supervised release, the applicable guidelines
        or policy statements issued by the Sentencing Commission pursuant to section
        994(a)(3) of title 28, United States code, taking into account any amendments made
        to such guidelines or policy statements by act of Congress (regardless of whether
        such amendments have yet to be incorporated by the Sentencing Commission into
        amendments issued under section 994(p) of title 28;

5) any pertinent policy statement—
    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28,
        United States Code, subject to any amendments made to such policy statement by act
        of Congress (regardless of whether such amendments have yet to be incorporated by
        the Sentencing commission into amendments issued  under diction 994(p) of title 28);
        and
    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is
        sentenced.

6) the need to avoid unwarranted sentence disparities among defendants with similar records who
    have been found guilty of similar conduct; and

7) the need to provide restitution to any victims of the offense.

The primary directive in Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2", as set forth above.   This directive, commonly called "sentencing parsimony" is defined as the least restrictive sentence necessary to achieve the purposes of sentencing.  See Kimbrough, 128 S.Ct. at 575-576 (a district court's judgment that a particular defendant's sentence was sufficient but not greater than necessary is entitled to great weight, even if the district court's judgment is based in part of its disagreement with the policies behind an applicable guideline).  Other statutory sections also give the district court direction in sentencing. Under 18 U.S.C. §3582, imposition of a term of imprisonment is subject to the following limitation: in determining whether and to what extent imprisonment is appropriate based on the Section 3553(a) factors, the judge is required to "recogniz[e] that imprisonment is **not** an appropriate means of promoting correction and rehabilitation" (emphasis added).

Sentencing courts have historically been afforded wide latitude in considering a defendant's background at sentencing. Under 18 U.S.C. §3661, "***no limitation*** shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" (emphasis added).  As a practical matter, this statutory language trumps the now-advisory policy statements in Part H of the sentencing guidelines, which list as "not ordinarily relevant" to sentencing a variety of factors such as the defendant's age, educational and vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of guidance as a youth and virtually any other facts that fits within the ambit of §3553(a).

### III.     Nature and Circumstances of the Offense and History and Characteristics of the Defendant

There is no limitation on the information that this Court can consider in fashioning an appropriate sentence.  See 18 U.S.C. §3661; 18 U.S.C. §§3553(a)(1).   While the offense of conviction is certainly serious, Mr. Blazer believes that there are notable facts and circumstances concerning the offenses of conviction and Mr. Blazer' personal characteristics which warrant the imposition of a non-custodial sentence in this case.   Mr. Blazer does not make his request gratuitously.  As set forth more fully below, this case presents the Court with a justification for such a sentence.

Mr. Blazer's prosecution centers his role as a financial advisor to professional and collegiate athletes.   Counts 1 through 4 of the Information relate to Mr. Blazer's misappropriation of clients' funds to invest in movie and music projects that were intended to benefit his clients.   Count 5 of the Information relates to payments made by Mr. Blazer to collegiate athletes to solicit those athletes to hire Mr. Blazer as a financial advisor.   Mr. Blazer absolutely accepts responsibility for his conduct and he recognizes that his conduct caused harm to a number of his former clients.   Mr. Blazer does ask the Court to consider that the funds that were misappropriated were not, however, used by him to fund a lavish personal lifestyle at the expense of his clients.   On the contrary, the movie and music projects for which he solicited clients' funds began to fail financially and required a substantial infusion of capital.     Mr. Blazer's misappropriation of the funds was designed to salvage the movie and music projects for the benefit of his clients.  Mr. Blazer's actions were fueled by his regrettable desire to make the

failing projects successful.    He asks the Court to consider that he is truly remorseful for betraying the trust of his clients.  He is further apologetic for his actions in attempting to recruit new clients by making payments to collegiate athletes.

Mr. Blazer also asks that this Court consider his personal characteristics.  He is 49 years old and, other than the offenses of conviction, Mr. Blazer has led an otherwise lawful life.  He has no prior criminal record.      Mr. Blazer is happily married and has three children.      Mr. Blazer's wife, Patricia, and his three children have written letters to the Court and those letters are attached hereto as Sentencing Exhibit 1.  As evidenced by those letters, Mr. Blazer is very close with his family.   He is very active in the lives of his children and has been a very positive role model for them.   He serves as a leader, a confidant and a provider to his family.   Mr. Blazer respectfully requests that the Court consider their words in determining Mr. Blazer's sentence.  Mr. Blazer also asks the Court to consider that he suffered a heart attack in 2010 and he continues under the care of a cardiologist who treats Mr. Blazer with medication and regular cardiac examinations.

Mr. Blazer also asks the Court to recognize that after the news of Mr. Blazer's guilty plea and involvement in the offenses of conviction became national news in print, television, online and social media, he became somewhat of a pariah in and around his hometown, a suburb of Pittsburgh, Pennsylvania.   He has lost friends as a result of the publicity and he now shies away from going out in public.   See Sentencing Exhibit 2, letter from Anthony E. Patterson.   The publicity from his guilty plea in this case has negatively impacted his ability to secure gainful employment.  As set forth in the presentence report, however, Mr. Blazer has found employment and he has remained employed throughout the pendency of this case.  His employer relates that Mr. Blazer is a valued employee and a very hard worker.   See Sentencing Exhibit 3, attached hereto.  Despite the demands on his time from cooperating with the government and the NCAA,

Mr. Blazer has continued to work hard to support his family. The consequences of his conduct in this case have, however, drastically erased his ability to earn the handsome salary he earned as a financial advisor.  Though his income has been substantially reduced, he currently works hard to provide the necessary support for his family and, in fact, Mr. Blazer's current employment provides the health insurance that covers his wife and children.

Mr. Blazer also urges the Court to consider the words of his various supporters.  Their comments are chronicled in the various character letters that are attached hereto as Sentencing Exhibit 2.  As the Court can see from the letters, Mr. Blazer is a person of character and responsibility.   Mr. Blazer has owned his conduct to those close to him and has not made excuses for his conduct.  His supporters, including his mother-in-law, describe him as a family man, not just limited to his wife and children but to his extended family.   They discuss how he has affected their lives in positive ways.    The tenor of the letters demonstrate that Mr. Blazer is not selfish, greedy or self-absorbed.   He is truly remorseful for his actions.   Mr. Blazer respectfully requests that this Court consider the words of his supporters in making any assessments concerning his character.

Mr. Blazer also asks the Court to consider the circumstances of his cooperation with the government and the National Collegiate Athletic Association ("NCAA") in this matter[1].   There has been print media, television media and social media coverage of Mr. Blazer's case and the cases of the other defendants who were prosecuted in the United States District Court for the

---

[1] A representative of the NCAA, one of Mr. Blazer's victims, will also provide a letter to the Court outlining the nature and value of Mr. Blazer's cooperation and Mr. Blazer respectfully requests that the Court consider the comments therein in fashioning an appropriate sentence.

Southern District of New York.  It is no secret that Mr. Blazer testified publicly at the trials of Christian Dawkins and Merl Code.  It is no secret that he provided substantial assistance to the government in relation to the prosecutions and convictions of Christian Dawkins, Merl Code, Munish Sood, Rashan Michel, Anthony Bland, Emanuel Richardson, Chuck Person, James Gatto, Thomas Gassnola and Lamont Evans.   While this Court is aware of the circumstances of each of these cases and has had the opportunity to observe Mr. Blazer's testimony, the nature of Mr. Blazer's substantial cooperation in the prosecution of these individuals has not yet been fully disclosed.  In part, Mr. Blazer will rely on the government to provide the specific details concerning Mr. Blazer's cooperation at the time of sentencing.  However, it is respectfully submitted that Mr. Blazer's cooperation in this was extraordinary and was far beyond the type of cooperation defendants typically provide in the course of a federal investigation.

As this Court is aware, Mr. Blazer was sued by the Securities and Exchange Commission ("SEC") in May of 2016 as a result of his misappropriation of client funds into movie and music projects, as described above.   Mr. Blazer, without the benefit of counsel, acknowledged his conduct and entered into a consent agreement with the SEC in May of 2016, the terms of which were made public and required Mr. Blazer to pay restitution to his former clients.   During the course of the SEC civil matter, Mr. Blazer was made aware of a federal criminal investigation into the same conduct that spawned the SEC civil action.

In May of 2014, Mr. Blazer met with federal authorities.  Consistent with his actions in resolving the SEC civil matter without counsel and without litigation, Mr. Blazer informed

federal law enforcement authorities that he possessed information concerning corruption in NCAA athletics.   In or around October, 2014, Mr. Blazer again met with federal law enforcement authorities and began cooperating with the government in an investigation into corruption in collegiate athletics.    Mr. Blazer immediately began acting in an undercover capacity, acting as a financial advisor seeking to enlist college athletes as future clients.    Mr. Blazer's cooperation continued after the public settlement of the SEC case.    Under the supervision and direction of federal authorities, between November, 2014 and October, 2016, Mr. Blazer travelled throughout the United States and met with player agents, "runners", high school and collegiate basketball players and family members and college football and basketball coaches.  For these meeting, Mr. Blazer flew to many different cities including, but not limited to, Atlanta, Georgia, New York City, Tuscaloosa, Alabama, Birmingham, Alabama, Miami, Florida, Orlando, Florida, Columbia, South Carolina, Washington, D.C. and Philadelphia, Pennsylvania.  He wore recording devices during all of these meeting and he made payments that were intended to induce the athletes to hire him as a financial advisor.    Despite the fact that Mr. Blazer was working as a confidential cooperator with the federal government, Mr. Blazer paid for his flights, transportation, hotel rooms and meals without reimbursement.  He personally advanced the sums paid to recruit athletes and to entice the athletes to become his "client" as he was posing as a business/financial advisor.  During this time period, Mr. Blazer was the only undercover cooperator in the investigation.

In approximately November of 2016 federal authorities began to finance the investigation and inserted a federal agent to work alongside Mr. Blazer in an undercover capacity.  Between

12

November 2016 and August 2017, Mr. Blazer participated in at least 25 operational meetings with agents of the FBI.   He continued to travel to various cities, including Las Vegas, to facilitate payments to grass roots and college basketball coaches, agents, runners, players and players' family members.  He always wore cameras and recording devices under the supervision of the FBI and recorded a number of conversations substantiating the payments.  The meetings occurred in luxury hotel suites, restaurants, clubs, grassroots basketball events, parking lots and even on a yacht.

During the course of Mr. Blazer's undercover cooperation, payments were made to or on behalf of assistant basketball coaches at the following universities: University of Auburn, University of Alabama, Arizona University, University of Louisville, Creighton University, Texas Christian University, University of Southern California, Oklahoma State University.   Mr. Blazer also made payments to third parties to benefit other athletes who attended other universities.

With Mr. Blazer's help, federal authorities coordinated a large-scale undercover investigation that spanned colleges and universities across the United States.   Ten co-conspirators were convicted of federal crimes as a result of Mr. Blazer's cooperation.   One NCAA head coach was fired.   Another NCAA head coach was suspended.   Many other NCAA assistant basketball coaches at high-profile universities were fired.   A prominent NBA agent lost his agent's certification.   There are pending actions alleging NCAA violations against a number of colleges and universities and Mr. Blazer continues to cooperate with the NCAA's

investigation into corruption.

Mr. Blazer's cooperation placed a strain on his family and required him to sacrifice time he would ordinarily spend with his family.   Because of the fluidity of the atmosphere surrounding the recruitment of high school athletes, Mr. Blazer was forced to act on short notice to take advantage of certain opportunities and he often had to leave his family on short notice to travel.   One such example occurred in December of 2016.   Mr. Blazer accompanied his son to a soccer tournament in Tampa, Florida.   Due to a preexisting obligation with one of his other children, Mr. Blazer's wife could not attend the soccer tournament.   While he was in Tampa, Mr. Blazer was solicited to meet with an assistant basketball coach from Auburn University, an Auburn basketball player and another person in New York City because the assistant coach wanted Mr. Blazer to meet with the player, pay the assistant coach $15,000 for his help to establish a professional relationship between Mr. Blazer and the Auburn player.   Mr. Blazer was reluctant to travel to New York City and leave his son behind in Tampa, however, Mr. Blazer was instructed by the FBI to do so.  Mr. Blazer made arrangements for another family to care for his son and he travelled to New York City.   He was unable to watch his son compete in the soccer tournament. At the meeting in New York City, Mr. Blazer met with the Auburn assistant coach and the high school basketball player.  Mr. Blazer paid the coach $15,000 and, during the course of the meeting, the assistant coach provided some of the money to the Auburn player. The assistant coach informed the player in Mr. Blazer's presence that "this is how you build trust in the NBA" and he told the high school player that Mr. Blazer would be his financial advisor at the professional level.   This meeting led to the prosecution and conviction of the Auburn

14

assistant coach but it also resulted in Mr. Blazer not being able to attend his son's soccer tournament.   This is just one example of how Mr. Blazer's cooperation adversely affected his family dynamic.

Mr. Blazer respectfully requests that this Court consider the fact that his cooperation with federal authorities in this case was extraordinary. He assumed substantial risks by virtue of his cooperation.  Between the time he first proffered with the government and his testimony in the federal trial, his cooperation spanned almost five years. He continued cooperating with the federal government after the settlement of SEC enforcement action became public and Mr. Blazer acknowledged his role in the offenses to which he eventually pled guilty.  He personally financed portions of his cooperation and he participated as the sole active undercover cooperator in the investigation for almost two years.   He then worked alongside an undercover FBI agent in a nationwide investigation that exposed the underbelly of NCAA recruiting.  He has endured intense national media criticism since his cooperation became public.  Ultimately, but for Mr. Blazer's extraordinary cooperation in this case, the successful prosecution of the many other conspirators, the exposure of corruption in college sports and the NCAA's current enforcement of its amateur regulations would not have occurred.

## IV. The Sentencing Guidelines Calculation

This Court is also to consider the sentencing guidelines as a starting point in fashioning an appropriate sentence.   Mr. Blazer recognizes that the advisory sentencing guideline range set forth in the final presentence investigation report regarding Counts 1, 2, 4-5 is 51-63 months' imprisonment and for Count 3 is 24 months' imprisonment which range is in Zone D of the sentencing guidelines chart.   It is no secret, however, that Mr. Blazer substantially assisted the government in the prosecution and conviction of at least 10 different participants in NCAA

basketball corruption.   Mr. Blazer respectfully requests that this Court consider any comments contained in a motion filed by the government in this case relating to his substantial assistance with the government in departing from these sentencing guideline ranges.

## V. Types of Available Sentences

By statute, a court must consider the kinds of sentences available in this case. 18 U.S.C. §3553(a)(5).  This Court has a variety of sentencing options available to it.  However, there is no mandatory term of imprisonment applicable in this case.  In considering whether an alternative sentence, below the guideline range, will further the goals of sentencing, Section 3553(a)(2) dictates that some of the key considerations include: that the sentence "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense", "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant."  For the reasons set forth herein, as these considerations pertain to Mr. Blazer, all are adequately met and justice will still be served with a non-custodial sentence.

### A.      Reflects the Seriousness of the Offense, Promotes Respect for the Law, and Provides Just Punishment for the Offense

Mr. Blazer has incurred and will continue to incur significant consequences as a result of his conduct.  He has lost lucrative employment opportunities and will be labelled as a convicted felon for the rest of his life.  The immense national publicity from his guilty plea has caused Mr. Blazer great humiliation and embarrassment among his family, friends, business colleagues and other peers.  This informal form of punishment has been real and severe.

16

This Court is permitted to vary from the advisory sentencing guidelines for such reasons.  See, e.g. United States v. Gaind, 829 F. Supp. 699, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); United States v. Vigil, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); United States v. Samaras, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good job as a result of his conviction).

While Mr. Blazer is respectfully requesting a non-custodial sentence, he in no manner means to demean the seriousness of the crime for which she has been convicted.  A non custodial sentence, however, is a serious punishment – a punishment which Mr. Blazer does not take lightly.  There is no question that such sentences are punitive.  Notably, the Supreme Court has noted that probationary sentences substantially restrict a defendant's liberty.  Gall, 128 S.Ct. at 595. (In imposing a probationary sentence, the Court noted "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. U.S.S.G. §5B1.3.  The Supreme Court has expressed that a probationary sentence "rather than 'an act of leniency,' is a 'substantial

restriction of freedom.'" Gall , 128 S.Ct. at 593.   In Gall, the Supreme Court referenced the

district court's memorandum opinion where the judge stated:

> [The defendant] will have to comply with strict reporting conditions along with a
> three-year regime of alcohol and drug testing. He will not be able to change or
> make decisions about significant circumstances in his life, such as where to live or
> work, which are prized liberty interests, without first seeking authorization from
> his Probation Officer or, perhaps, even the Court. Of course, the Defendant
> always faces the harsh consequences that await if he violates the conditions of his
> probationary term.

Id.   In Gall, the advisory guideline range suggested a term of imprisonment of 30-37 months.

The defendant in Gall was not the beneficiary of a §5K1.1 motion.


Additionally, there is legal support for a non-custodial sentence in the face of an advisory

guideline range that suggests imprisonment.  The Third Circuit affirmed a probationary sentence

in a case where the advisory guidelines range was incarceration. See United States v. Howe, 543

F.3d 128 (3rd Cir. 2008).     In Howe, the defendant was convicted of two counts of wire fraud.

Prior to pleading guilty, the defendant had been interviewed by law enforcement officials but

provided "questionable and inconsistent" statements to the government. The defendant was

convicted after trial and his advisory sentencing guideline range was 18-24 months'

imprisonment.   Like the defendant in Gall, the defendant in Howe was not the beneficiary of a

§5K1.1 motion.    After a sentencing hearing, the district court sentenced the defendant to 24

months' probation including three months' home detention. 543 F.3d at 131.   In sentencing the

defendant to that particular sentence, the district court relied on circumstances such as the

defendant's remorse, his pre-offense honorable and lawful life, lack of criminal history and

service in the U.S. military. 543 F.3d at 137.   The government appealed the probationary

sentence as unreasonable.  The sentence was affirmed.  The Third Circuit explained that while none of these circumstances alone may have been extraordinary to warrant the variance, the totality of these circumstances justified the variance invoked by the district court.  543 F.3d at 137, 138.

Similar to the defendant in <u>Howe</u>, Mr. Blazer has demonstrated remorse, has led a pre-offense honorable and lawful life and has no criminal history.   These factors, combined with the other circumstances set forth herein warrant a probationary sentence in this case.

**B.      Deterrence**

A sentence of probation also satisfies the deterrence prong of Section 3553.  Under this prong of Section 3553(a), courts assess whether a sentence will provide sufficient specific deterrence to the defendant from committing future crimes, and general deterrence to the public, deterring others from committing similar offenses.

**1.      Specific Deterrence**

Mr. Blazer has been thoroughly deterred by the consequences he has already experienced, as set forth more fully above, including the tremendous humiliation and shame she has brought onto himself and his family.   He has also exhibited a full understanding of what he did wrong and has taken steps necessary to remedy those wrongs through his extensive cooperation with the government.      Under 18 U.S.C. §3582, a sentencing judge is required to "recogniz[e] that

imprisonment is ***not*** an appropriate means of promoting correction and rehabilitation" (emphasis added).    Because Mr. Blazer has truly learned from his mistakes, a non-custodial sentence satisfies the goal of specific deterrence.

## 2.    General Deterrence

Under the circumstances of this case, a custodial sentence is not required to achieve the goal of deterring others from violating the law.  Here, the collateral consequences of the offense, including:  the publicity surrounding this case, as well as any additional non-custodial punishment this Court could impose, satisfy the goals of general deterrence.

Frequently, the government argues that a prison sentence is the only way to vindicate the government's interest in obtaining justice and promoting deterrence.  Mr. Blazer wishes to point out that while there is no doubt that the likelihood of being arrested and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." Id*; see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm; Restorative Justice and While Collar Crime*,* 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").    In white-collar cases, research has disclosed that there is no difference in the deterrent effect of a non-custodial sentence and that of imprisonment. *See* David Weisburd *et*

*al.,* Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al*. Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-1S (2011). In fact, "[t]here is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective "white collar" offenders." *See,* United States v. Adelson, 441 F.Supp.2d 506, 514 (S.D.N.Y. 2006). Moreover, another study suggests that it is the criminal justice process, not a lengthy prison sentence, that sends the most convincing message:

> [Studies show] no significant difference in recidivism between white-collar offenders sentenced to prison and similar offenders who did not receive a prison sentence. This finding is consistent with the research on specific deterrence and conventional crime. Based on their review of the literature, these researchers stated, "[a]t least since the 1970's, criminologists have consistently shown that those who are sentenced to prison have, at best, about the same rates of recidivism as non-imprisoned offenders, and in some cases, a much higher rate. They speculated that perhaps the criminal process itself–charge, trial, conviction, and sentencing– has the greatest impact on the offender, and the period of imprisonment adds little by way of deterrence. "Whatever specific deterrence is gained," they argue, "may be produced before the imprisonment sanction is imposed."

Elizabeth Szockyj, Imprisoning White Collar Criminals?, 23 S. Ill. U. L.J. 485, 495 (1999).

**C.      To Protect the Public from Further Crimes of the Defendant**

While recidivism is an important factor for a sentencing judge to consider, Mr. Blazer poses no threat to the community and thus it is not a factor weighing in favor of a term of imprisonment in this case.  *See* Pepper, 131 S.Ct. 1229 (finding the likelihood that the defendant will engage in future criminal conduct is a factor that sentencing courts must consider in imposing sentence).   Mr. Blazer asks the Court to consider that he presents a minimal risk of reoffending.   Until his current legal troubles, Mr. Blazer's life was spent as a law-abiding citizen. As set forth above, he is 49 years old and he has no prior criminal record.  Defendants "over the age of forty…exhibit markedly lower rates of recidivism in comparison to younger defendants."  See, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*,* at p.28 (2004), www.ussc.gov/publicat/Recidivism General.pdf. (stating that for those defendant in Criminal History Category I, the recidivism rate for defendants who are over 50 is 6.2%, whereas the recidivism rate for such defendants between the ages of 41 and 50 is 6.9%, and for those defendants who are between ages 21 and 40, it is between 12% and 22%).   Additionally, there is also statistically an extremely low (and arguably nonexistent) risk of recidivism in this case.   The United States Sentencing Commission ("Sentencing Commission") in a recent study[2] identified several characteristics that are indicators of reduced risk of recidivism, including the following:

- Age:  Recidivism rates decline as age increases, from 71.1% under age 21, to 14.0% over the age of 60.[3]

2.      Recidivism Among Federal Offenders: A Comprehensive Overview ("Recidivism Study") (Mar. 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

3.      *Id.* at Appendix A-1, p. 44.

22

- Education:  Recidivism rates decrease with educational level.  Offenders who are college graduates have a 19.1% rate of recidivism.[4]

- Lack of criminal history:  Individuals who have zero criminal history points have the lowest rate of recidivism.[5]

Other factors are also of import in considering a defendant's likelihood of recidivism, as detailed in the 2004 Sentencing Commission study[6]:

- Marital Status:   Category I Offenders, who were married and/or divorced have the lowest rate of recidivism. [7]

- Employment Status:   Category I Offenders, who were employed the year prior to the instant offense, have the lowest rate of recidivism, 12.7%. [8]

Here, Mr. Blazer is a college graduate, has a solid record of legitimate employment and a criminal history score of zero.    Consequently, both the Sentencing Commission studies and case law support the determination that Mr. Blazer poses a very low risk of recidivism.   See, e.g., United States v. Darway, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); United States v. Hamilton, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court  abused its discretion in not taking into account policy considerations with regard to age recidivism  not included in the Guidelines"); United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming  below-guideline sentence based on defendant's age, which made it unlikely that he would again be  involved in a violent crime);

---

4.      Id.
5.      Id. at Appendix A-1, p. 40.
6 .     "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,"    United      States       Sentencing       Commission      (2004),     available       at, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.
7.      Id. at p. 29.
8 .     Id.

United States v. Urbina, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar  5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive  work history, and strong family ties); United States v. Cabrera, 567 F. Supp. 2d 271, 279 (D. Mass.  2008) (granting variance because defendants "with zero criminal history points are less likely to  recidivate than all other offenders"); Simon v. United States, 361 F. Supp 2d 35, 48 (E.D.N.Y. 2005)  (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); United States v. Nellum, 2005 WL 300073 at (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); United States v.  Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains  from criminal conduct" before committing his first offense).    Importantly, not only does the record suggest that Mr. Blazer will never engage in unlawful conduct again or become a recidivist of any type of crime, the record indicates that his post-offense conduct reflects his commitment to doing the right thing.   The public does not need to be protected from Mr. Blazer because of the remote likelihood of recidivism in this case.

## VI. The Need to Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct

An additional concern of the federal statutory scheme is the need to avoid unwarranted sentencing disparities among defendants with similar criminal histories who have been convicted of similar conduct.   18 U.S.C. §3553(a)(6).   This concern may also include the consideration of unwarranted similarities among defendants who are not similarly situated.  See

Gall, 552 U.S. at 56. (Sentencing court "also considered the need to avoid unwarranted similarities among other co-conspirators who were not similarly situated.)    Additionally, and important to this case, a defendant's sentence will not automatically be deemed substantively unreasonable if it is more lenient that a sentence imposed on similarly situated co-defendants. "Although courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), a '[d]isparity of sentence between co-defendants does not of itself show an abuse of discretion,'" United States v. Hilliard, 726 Fed.Appx. 918 (3$^d$ Cir. 2018) citing United States v. Cifuentes, 863 F.2d 1149, 1156 n.5 (3d Cir. 1988).

It is respectfully submitted that the particular circumstances of Mr. Blazer's case are different from other similarly situated defendants in this case and in other cases.   Mr. Blazer's cooperation in this case has been extraordinary and substantial.   Undersigned counsel has been practicing federal criminal law for over 26 years and has never represented a client who has cooperated to the extent that Mr. Blazer has in this case.    As a result, consideration of this factor is not particularly relevant.

**VII.    The Need to Provide Restitution to Any Victims of the Offense**

An additional concern of the federal statutory scheme is the need to provide restitution to any victims of the offense of conviction.    18 U.S.C. §3553(a)(7).    Mr. Blazer has already negotiated a consent order with the SEC requiring him to pay restitution and it is anticipated that

the parties will present the Court with a consent order in this case relating to the amount of restitution.

## VIII. The Need to Provide Educational or Vocational Training, Medical Care or Correctional Treatment

Based on the foregoing, providing Mr. Blazer with needed educational or vocational training, medical care or other correctional treatment while legitimate considerations, are not issues which warrant a custodial sentence in this case.  See 18 U.S.C. §§3553(a)(2)(D).  In fact, as set forth above, Mr. Blazer is currently employed and will continue to be employed. He is providing for his family and further educational or vocational training is not necessary.

**IX. Conclusion**

As set forth above, Mr. Blazer is 49 years old and he has led an otherwise law-abiding life. As outlined by his many supporters, he has many redeeming qualities.  The offenses of conviction are serious and Mr. Blazer fully accepts responsibility for his conduct.  He has pled guilty in this case and he has extraordinarily cooperated with the government and one of the alleged victims, the NCAA, in separate investigations.  His post-offense conduct has been exemplary.  It is respectfully requested that the Court consider the comments herein, invoke its discretion and depart and/or vary from the advisory sentencing guideline range and impose a non-custodial sentence in this case.

Respectfully submitted,

    s/ Martin A. Dietz            .
Martin A. Dietz, Esquire
Pa. I.D. No. 69182

The Mitchell Building
304 Ross Street, Suite 505
Pittsburgh, PA 15219
(412) 261-5520

Attorney for Defendant,
Louis Martin Blazer